Case 22-1789, MRP Properties Company LLC et al. versus United States. Argument not to exceed 15 minutes per side. Ms. Melton. Morning. Morning, your honors. May it please the court. Michelle Melton on behalf of the United States. I'd like to reserve three minutes for rebuttal. Sounds good.  that to any extent manages, directs, controls, or conducts any of a facility's activities that produced pollution. This standard is inconsistent with a straightforward reading of best foods. Best foods standard requires a more direct nexus to the handling and disposal of hazardous waste or environmental compliance than the district court's test allowed. In other words, best foods test recognizes the distinction between operations that produce waste and operations that concern the release of the waste produced. The district court's error stemmed from its desire to reconcile the best foods standard with FMC's substantial control test. The district court held that FMC's substantial control test is still good law and found particularly relevant FMC's four indicia of control. But the best foods standard displaces FMC's substantial control test and its indicia of control. Many courts. You used the phrase more direct nexus than the district court thought and I thought that just to me captured the whole area and the problem for judges of, you know, okay, if it's a spectrum and where on it is it and it just makes judges nervous. Are there, do you think there are other categories? I mean, do you, I take it we can't say regulators, for example, are never operators because I take it you'd be worried there could be a situation where you could have so much regulation that it really does become operation or, but do you have any categories you might be able to propose for us? I don't have any categories and we're not asking this court today to define the entirety of the universe of what counts as specifically related. Just tell us whether it's a sufficiently direct nexus, right? That's all you want us to do. We actually would just like you to reiterate, as you did in Brighton and as you did in APU, that best foods applies the test and we think that the FMC test is not reconcilable with best foods. Of course, in some cases there may be overlap and we're not saying that the indicia of control are not relevant in any case at all. But we don't think that those indicia of control are sufficient to establish operator liability. So I can give you a few examples of what we think might render the United States liable here if there was sufficient control, but examples of something that might include specifically related to pollution. We think the New West case is a really great example. There the government was acting in its regulatory capacity and its capacity as the lessor, but it said put the waste here, not where you want to put it, lessee. We want you to put it over here and we want you to treat it this way. We think that that is a very clear instance of management direction or control specifically related to pollution. There's some other examples that I can offer this morning. So in PPG, the polluter there alleged that the government had told it exactly how to make the products, not just the specifications, but what processes to use. We think that under certain factual circumstances that could count. In the PPG case, the Third Circuit said that there just wasn't evidence that that was the case, but we think that that would count. Another example would be if there were, in this particular fact circumstances, if the government had issued a directive saying here's how we want you to maintain your facilities or we want you to address leaks on a bi-weekly basis. There's just no evidence of anything like that on this record. Is that because it happened so long ago or is it just because that wasn't how it worked? The government was focused on winning the war and just said get us the fuel, get us the fuel, get us the fuel. The government was not at these refineries on a day-to-day basis. It was operating at arm's length from these refineries. We have facts in this record that there was a fire at one of these refineries and the government didn't know about it for months. So we think that the passage of time is not the reason that there's not evidence in this particular case. And in fact, you know, in other cases there may be such evidence. In the Exxon case, for example, Exxon had evidence that the United States had said, you know, we only have so much scrap metal. You can't use it for this kind of oil treatment process. We don't want you to do that. The court there still said that that was not sufficient to render the United States liable as an operator. But there's nothing like that here. I have a question about how you interpret the best food standards. The definition of circular liability is, let me just read it to get it back in the brain. You must manage, direct, or conduct operations specifically related to pollution. That is, operations having to do with leakage or disposal of hazardous waste or decisions about compliance with environmental regulations. My question to you was going to be what you think that is means, whether it defines a closed or an open class. But I'm understanding from your argument that you do agree that it's an open class. It is not limited to operations having to do with leakage or disposal of hazardous waste or decisions about compliance. It can, those are examples as opposed to limitations. Is that a fair reading of the definition? No, Your Honor, that's not how, we do think that having to do with modifies specifically related to pollution. We just think that the, what counts as having to do with the leakage or disposal of hazardous waste can take many forms. It's not just that I tell you to put the waste here and you just, you know, instead of over here, that obviously would count. But, you know, we're not trying to elaborate all of the factual circumstances of what has to do with leakage or disposal because, you know, there's many different types of facilities. There's many different types of ways that people conduct managed or direct operations. So the categories are not full limitations, they're explanations of, it must be defined by the facts in each case. Yes, that is fair, but we do think that there does have to be, it does have to do with leakage or disposal of hazardous waste or compliance with environmental regulations, yes. Thank you. So what's the, purchasers you would think would rarely be operators, right? I mean, this is a purchaser situation and the reason it's hard is they're also a regulator. But is it fair to think that purchasers, that would be the odd setting to be an operator or do you have examples outside the government realm where purchasers can be regulators, I mean operators? Well, the district court's opinion reads broadly enough that I think many purchasers, many parents would be liable for their subsidiaries if they direct their subsidiary to make a product and purchase that. Well, let's circle back to that one, but how about they're not related companies? So it really is just a plain old purchaser situation. I think that there are lots of purchasers that exercise extreme market power. I think Amazon is a really good example. If I'm putting my stuff, I mean, it's not a circular example, but. Are you going to do an antitrust argument? But I just, I think what the district court. I mean, I guess maybe I should explain what the intuition, I'm just trying to think through it. It would seem it would be rare for a purchaser to care about what the seller is doing with leakage waste. Like they would just kind of, I would think their general counsel's office would be saying, don't touch, I mean, just ask what you want, volume, if they can provide it, they can provide it at a price that works, end of story. So it just seems like that would be very odd to have purchasers that aren't regulators and aren't related companies as operators. Don't worry, I'm not like saying we're going to say some, I'm just trying to think through it. Aren't I right that that's a weird situation to be an operator? I think you are right, and I think that that's actually the facts here, right? I mean, the government just wasn't going to these facilities. And I'm not here to argue the facts, we're not challenging the facts here, but the government, there really aren't facts in this record where the government was going to these facilities and saying, put your waste there or get rid of it off-site, because the government really was a purchaser. Now, the government also had other roles, it was an allocator of scarce materials. But I think your intuition is right, that purchasers usually don't necessarily have much say over what happens at the facility, and that was really true here as well. And the purchaser situation where they're related companies, so parent sub, and you're supplying some chemical from the sub to the parent to make this other product, that's just different because they're related companies. I mean, I guess it's just going to be very contextual, but that doesn't strike me as strange to have them be operators. Well, that actually was the facts in Best Foods. If you look at the decision after it was remanded, there were facts in that case that the district court found that, in fact, the parent there did ask the sub to make particular products in a particular amount. And the district court there said that that wasn't sufficient for liability. I don't think that's that unusual, actually, in the parent sub context is I guess what I'm saying. Maybe another example, if the government directed a refinery to change its technology, for example, to use maybe a different kind of refinement system that the government acknowledges publicly would create more waste product. And if the refinery can't dispose of that additional waste product, would you still call that pollution incidental? So I think there's a lot going on in your question. There's a question of whether the government was being coercive in that instance and saying you have to make this product. And we're not, the district court here obviously found that that was the case here. We dispute that. We're not arguing that today. But I think that that's one part of it. So if the question I think about whether it's related to pollution is if the government is saying please make this product. We know that it results in more waste. We do not think that that's sufficient. And that's consistent with the PPG decision. What PPG said, more waste is not the same. More waste is not enough. Yes, the government asked you to produce. You produced. And you produced more waste. But the government didn't tell you how to manage the waste or how to actually make the product itself. Okay, which is a little bit different from what I'm positing. That they say you must use this new technology. And then it's produced that way. And there's an inability to dispose of all that waste. I think that would be a closer case, Your Honor. There's certainly, I mean, there's no facts of that here in this record.  If they were to bring forward such facts, whether that counts, I think we'd have arguments about whether it does, whether it doesn't. But it's certainly a much closer case than what we have here where the district court just looked at the condition of control and essentially said the United States, and this is on page 34, 41, and 48 where it's going through, said, you know, no reasonable juror could conclude that the government action had nothing to do with the amount of waste produced. So, as I mentioned earlier, you know, we asked the court to hold the district court's definition of operators inconsistent with best foods. And as I've mentioned before, we think there are other, also, excuse me, also other errors with the district court's opinion. But we're not asking the court to address those errors at this juncture. We think the appropriate place to present those arguments is on remand. We ask the court to reverse the order and remand for further proceedings consistent with best foods. Okay, thank you. You get your full rebuttal, and Ms. Barks. Thank you. And you. Morning. Good morning. May it please the court. My name is Jennifer Barks. And I'm here today on behalf of the Appleys, the Valero companies. The United States is encouraging this court to adopt a new and an overly narrow interpretation of operator liability that would restrict operator liability to a subset of operators contemplated by CERCLA and by Best Foods. CERCLA's text and precedent do not support this position, but instead make clear that Judge Luddington used the correct operator liability standard and that he properly granted summary judgment for Valero. And we're asking this court to affirm. What would you say the U.S. did that was focused on, you know, actual, you know, directions as to what to do with pollution risks, whether it's leakage or whatever else it was? What do you think the best facts are for you on that front? Well, I think that there's three things that I wanted to highlight for this court. Okay. I think first, there is not a requirement  on how to dispose of waste. Best Foods, the Supreme Court, had an opportunity to require that, and they simply didn't. They said that an operator is someone that manages, conducts, or directs operations related to pollution, which is having to do with the leakage or disposal. Do you agree it can't just be buying, or do you not agree with that? Purchasing? Yeah. Of course, I agree. It's not enough by itself. No, absolutely not. That has been litigated, and I think that's definitively resolved, that simple contractual relationships do not raise operator liability. Same thing, even if you're really buying a lot, like where, because definitely risks of pollution go up the more you're demanding of a producer, right? You've got to make, you know, these timelines and get this volume of petroleum, whatever it is, but that also doesn't change things, does it? No, I don't think so, and that's not the case here. Okay, so what is the next thing? Is it that they're regulating? Well, I think here the government, of course, did have a role as a consumer, but the district court found, after reviewing the weight of the evidence and the totality of the circumstances, that the government was acting as so much more, and as the United States conceded today, they played other roles during the war, and they went far beyond just a mere consumer. A mere consumer doesn't have the ability to seize a plant, to imprison noncompliant managers, or to impose civil penalties. Aren't all those things related to the actual production of the facility? And doesn't CERCLA require that that relationship be to leakage or disposal of hazardous waste or decisions about compliance? It does, and I think that's what we have here. Well, because you have a facility that produces something, some of your briefing seems to indicate that if you produce the product that has this byproduct of waste, that's good enough to hold you in. Tell me why under CERCLA's definition you would think being in that end as opposed to actually having some control or action over the operations of disposal of waste or compliance. What's enough? Well, I think just looking at the definition of operator under CERCLA itself, it's somebody that operates a facility at the time that hazardous waste is disposed of there. And disposal can be something that's passive. It can be spilling or leaking, as Best Foods acknowledges. And so sometimes the actual production and refining operations are inseparable from disposal. There are, and the record supports, that there are unintentional releases that occur during production where nobody has made a decision about where or how to make this disposal. But still. When you say unintentional releases, it just seems to take you back to just high volume purchasing. Well, I don't agree respectfully because a simple purchaser doesn't have the control over the facility that the government hears of. You said unintentional, so that made it sound like the purchaser had nothing to do with it. It happened, but they're still liable because it's, for example, quite foreseeable. I mean, if it's foreseeability, I quite agree. High volume purchasers in the middle of an epic war probably are operators. But I didn't think that's what we were supposed to do after Best Foods. No, and I agree with you. I think it's when you look at the totality of the circumstances, the United States required the refineries to do things that they wouldn't have otherwise have done, and they had no option but to say yes. And so, for example, many of the refineries produced a brand-new product called Kodimer, which they had never produced before and only had value during the war. And they would have never made it but for the government's direction. And that had a brand-new hazardous catalyst that they used that they would have never had at their refineries. And by manufacturing exactly what the government directed them to do, there were brand-new instances of waste, whether it was through unintentional disposals during production or disposals afterwards. What about the products that they produced that had hazardous waste that before the government came in, they were handling in a specific way. While the government was there, they continued that same specific way. And after the war was over, they continued that same specific way. Why would that be the government having any control over the disposal? Well, I think that that goes back to they were controlling what was coming into the plant, what the plant was producing on a day-to-day basis, and that changed and impacted. Were they there on a day-to-day basis? Isn't there a good bit of evidence in the record that events happened? You know, one refinery had a fire and the government didn't know about it for months. It seems to me what you've got is a government who says, we are in this position. We have got to have this product. You go do it. Not inside each refinery saying, here is what you do today. Here is how you dispose of that tomorrow. Isn't that an important distinction for CERCLA? I do think that making affirmative acts that control the facility on a regular basis is important. But I think there is not a necessity that someone is physically there on a daily basis saying do this or do that. I think that the record shows that they issued monthly, weekly, and even daily operational directives to these refineries, which changed what they did on a daily basis. So whether or not there was a physical presence there, every day each of the refineries was doing exactly what the government told them to. Are there any facts in the record where the Valero folks or their predecessors responded to this government order and said, are you kidding me? You want us to do that much in two months? And the government said, absolutely. We're going to lose the war if not. And they respond by saying, well, the only way to do this is to not have as many people helping us with this disposal, or we're going to have to change the way we make it. And when we do that, it generates more waste. And the government said, it's your call. We don't care. Produce it. Is that in the record where that kind of thing happened? There is some evidence of that. For example, there's correspondence in the record where in Houston and the Eastern plant, the plant manager wrote to the government. They didn't want to dispose of hazardous waste from a government-connected plant in their own facility, and they wanted to burn it over in the government's facility. And the government said, don't burn it there. Don't burn it there. Whatever you do, don't burn it there. But don't let this waste slow down production. And so I do think that there's some evidence of that. But in that situation, they said, we're not going to let you burn it on our property? That's showing they're not an operator. They're not going to burn it on the government's property. I know. I'm just making the point. I'm not sure how that helps you. I mean, like if I, in a regular purchasing situation, forget the government for a second. They're very demanding. We can sell and make lots and lots of money if you do this. But they insist, never, don't dispose of it anywhere near us. They are kind of preserving the lines, aren't they? Well, I think the implication is dispose of it on your property, which would help make them an operator. I think it's see no evil, hear no evil, just get us the stuff. But see no evil, hear no evil is not what CERCLA contemplated. I mean, what CERCLA's goal is is to make everybody that is responsible for hazardous pollution contribute to the cost of cleanup. It's not the most responsible party or the primary operator. It's anyone under the sun that helped make pollution should be responsible for contributing to the cleanup. And that's a really, I agree, that's a really important provision and intent. What I'm struggling with is a little bit of the purchaser example, because what comes to mind is a behemoth purchaser like Wal-Mart. Wal-Mart comes in and says, I'll have 50 bicycles today, and next week I want 450. And they're a juggernaut. And if that company wants to have a contract with Wal-Mart, they do what Wal-Mart asks for on the timing that Wal-Mart asks. And I can't imagine that that would make Wal-Mart an operator if in order to meet this opportunity to sell this amount, they don't dispose of something appropriately. No, absolutely not. And I fully agree with you. I think the difference there is the company has the choice whether or not to enter into that arrangement. They can determine whether or not they want to manufacture these bicycles for Wal-Mart, for example. Isn't there some evidence in this record of the government saying we're trying to get them to do this and they won't? We have to assist, they want to add on, we have to pay them some money so that they can do that, because otherwise they're just not going to do it. That being that the government, in fact, did not take over those plants, which was an option. I think there's some instances of that. And I think that, for example, the district court acknowledged any government contracts that might be in the record, that's something that merits consideration. And for the sake of summary judgment, we're going to consider those contracts to weigh against operator liability. So I do think that that was considered, but it was overwhelmed by the vast majority of the evidence that shows that on a totality of the circumstances, which is the review that CERCLA requires, that there was coercive control and that the refineries had no choice but to do exactly what the government was asking. And I think that came through multiple ways. It came through directives that were legally enforceable through the matrix of war era legislation, that non-complying fineries would be subject to seizure and civil penalties and basically any other punishment that the Petroleum Administration for War deemed fit. And I think it also came informally through conversations and letters where the Petroleum Administration for War admitted they used ultimatums to get refineries to do what they wanted, regardless of the form that their instructions came in, by withholding crude oil or other raw materials that the refineries needed to operate. And I think the district court, after his expansive review of the record, correctly found that no one could reasonably dispute that there was exertion of control and operation of these refineries to some extent. And I think to some extent is very important here because what we're deciding today is simply liability. There is a phase two of this litigation where damages and allocation and divisibility would be addressed. But today, all we're trying to decide is whether or not the government, to any extent, was an operator. And I think the overwhelming majority of the evidence is very supportive of Judge Ludington's opinion. Let me just give you one last way to think about it. I mean, the thing I get is if you're really demanding and you say, you can only produce this, you have to produce this volume of it, and it really stresses the entity, it's true in a sense. There's some management. This directive is really affecting how things are done. It may change the way they do lots of things. But for me, if that's all they're doing, even though I know for sure it's probably going to affect disposal and other things, I don't think that's operator. I feel like you have to have something more, something that says, here's how to do this, here's how to do that. Just the insistence that you have to only do this, do it on this timetable, I mean, I know for sure it's going to affect what happens in terms of pollution, but I'm still not thinking that makes you an operator. Well, Your Honor, if that's the evidence that you're seeking, I think that the record does have that. For example, when we were discussing Kodimer earlier, the government specifically targeted refineries that they knew had a certain type of cracking unit that could be converted to create this new product. And so I think by ordering the refineries to do that, they were essentially ordering them to convert this very specific piece of machinery that was built to make one product and use it to make another. And by doing that, these machineries, they're custom-made, they're very specifically tuned to make a certain product, and when you use them for something that they're not intended for, they're inefficient, they create different and unintentional kinds of waste, they create more waste. And so I do think that there's evidence that even to that very detail, the government did in some ways direct specific operations. But I do think, again, looking at the big picture and at Best Foods, there wasn't that very specific direction that they have to change operations. There can be successive operators that all do the same thing and could all be jointly liable. One last question. Is there a good case for you, District Court, Court of Appeals, where it's World War II and government's treated as an operator? I think the best case is FMC. I think in that case, it has a lot of similarities to ours, and I see I'm running low on time, but just to answer very quickly, I think one of the most important things in FMC that's similar here is the government directing them to make a new and a different product that that facility had never made before, and then the court found that but for the government's direction, there was a new waste that would have never existed at that facility. And that's exactly what the district court found for each of the refineries here. Thank you. Thank you. We have a rebuttal from Ms. Melton. Thank you, Your Honors. I'd just like to make three quick points. First, I heard my friend on the other side saying that we were asking for an overly narrow standard. That's not the case. This is a two-way street for the government. Today, we're on the defendant's side, but tomorrow, you know, we may be on the plaintiff's side trying to hold some private party liable as an operator. You know, we're not trying to narrow best foods. We are trying to implement best foods, and this is how we understand the standard. Second point, the court here viewed the totality of the circumstances through the lens of FMC. I think that's really clear if you look at what the court is saying, both in its opinion and in its footnotes. And so to the extent that my colleagues are arguing that there is evidence in the record that would support operator liability, we think that that needs to go back for remand. This is a question of applying fact to law, and the court got the law wrong here. And so to the extent that there are questions about certain documents in the record, we think that that can be properly adjudicated on remand in the first instance by the district court. That goes to Kodimer as well. My friend said that these refineries were forced to produce Kodimer. There were only five refineries in this case that produced Kodimer, and our position is that that was not coercive. But again, we think that the proper place to sort of present those arguments is on remand under the correct standard. And just the third point is about allocation. This can be adjudicated at allocation. We should do this there. Two quick subpoints about that. First, that's incredibly burdensome for us. We don't think we're liable at all under the correct standard, and so we think it's – I mean, that's why we're here today taking this interlocutory appeal. We just don't think that we should have to get there. We would have to do extensive discovery. The trial here alone would take months. That's what the district court itself said. And we just don't think that that's necessary here. Second, and perhaps more importantly, the proper standard affects the allocation phase because we have to know what we're liable for, what time period are we liable, and what conduct are we liable for. And that's the basis for allocation. And we can't do that if we don't have the right standard. So I'll just wrap up here unless the court has any further questions. Thank you very much for your time. We ask the court to vacate and remand for further proceedings. Thank you. Thank you, Ms. Melton, and thank you, Ms. Barks, for excellent arguments and excellent briefs. We really appreciate it. It's a difficult case, and it's wonderful to have good lawyers. So thank you very much. The case will be submitted, and the clerk may call the next case.